**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION | ) ) ) ) |
| Plaintiff, | ) Case No: ) |
| vs. | ) ) |
| Phillip Galles, Tyche Asset Management LLC, Tyche Master Fund Ltd, Tyche Asset Trade LLC, Tyche Offshore Fund Ltd., Tyche Onshore Fund LP, Tyche PML Master Fund Ltd, Tyche PML Onshore Fund LP, and Tyche Onshore Fund GP, LLC, | ) JURY TRIAL DEMANDED ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY**
**PENALTIES, AND OTHER EQUITABLE RELIEF**

The Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its attorneys, hereby alleges as follows:

## I.   SUMMARY

1.      Phillip Galles is stealing funds from victims he solicits to participate in what he describes as a "managed futures fund." Galles has deceived, and is continuing to deceive, participants into depositing funds with the Tyche entity defendants he owns and controls. Galles has made grandiose claims that Tyche has "billions" of dollars under management, with yearly investment returns supposedly exceeding 200%. In fact, Galles is operating a Ponzi scheme. He has comingled participant funds in various bank and trading accounts, misappropriated a portion of the funds deposited by participants to fund a lavish lifestyle, and used other participant funds to pay back earlier participants, having used almost none of the funds received from participants to place any trades.

2.      Since at least October 2019 and continuing to the present ("Relevant Period"), Galles has fraudulently solicited and accepted at least $6,000,000 from approximately 50 persons throughout the United States to participate in the Tyche entities he owns and controls, and which operate as a common enterprise:  Tyche Asset Management LLC, Tyche Master Fund Ltd., Tyche Asset Trade LLC, Tyche Offshore Fund Ltd., Tyche Onshore Fund LP, Tyche PML Master Fund Ltd, and Tyche PML Onshore Fund LP (collectively, "Tyche," or "Tyche entity defendants").  Galles comingled participant funds in various Tyche entity bank and trading accounts in a pooled investment scheme for the purported purpose of trading commodity futures and options, among other investment products.

3.      Galles and Tyche made misrepresentations of material fact to actual and prospective participants in the Tyche commodity pools concerning, among other things, his and Tyche's experience and expertise, the profitability of Tyche's trading activity, the use of funds invested with Tyche, and the purported profits participants made on their interests in the Tyche commodity pools.

4.      Galles has also lied to regulators.  In filings with the National Futures Association ("NFA"), the self-regulatory organization for the U.S. derivatives industry, Galles falsely claimed that the Tyche commodity pools were inactive and were not soliciting participants.  Galles repeated this lie to NFA representatives when they later asked him directly whether Tyche was soliciting participants and managing funds for participants.

5.      By engaging in this conduct and the conduct further described herein, Galles and Tyche engaged, are engaging, or are about to engage in acts and practices that violate the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26, and Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1-190 (2022).  Specifically, Defendants have:

> (a)      committed fraud in violation of Sections 4b(a)(2)(A)-(C), 4o(1)(A)-(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6o(1)(A)-(B), 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022);

(b)     failed to operate their commodity pools as legal entities separate from the pools' operator, failed to receive pool participants' funds in the name of the pools when funds were deposited funds into Tyche Asset Management LLC's bank accounts, and commingled the property of the pools and pool participants' funds with property of Defendants and others in violation of Regulation 4.20(a)-(c). 17 C.F.R. § 4.20(a)-(c) (2022); and

(c)     made false statements to NFA in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

6.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

7.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-l(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

9.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-l(e), because Defendants transacted business in this District, and acts and practices in violation

of the Act have occurred, are occurring, or are about to occur within this District.

### III.   PARTIES

10.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the responsibility for enforcing the provisions of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2022).

11.    Defendant **Phillip Galles** resides in Chicago, Illinois and is a principal and owner of the Tyche entity defendants.  Galles is registered with NFA as an Associated Person ("AP") of Tyche Asset Management LLC, a CFTC-registered Commodity Pool Operator ("CPO").  Galles operated the Tyche entity defendants, and his fraudulent scheme, primarily from Chicago.

12.    **Tyche Asset Management LLC** is a Delaware limited liability company organized in October 2019, and during the relevant Period maintained offices at One North Wacker Drive and One South Dearborn Street in Chicago, Illinois.  Tyche has been registered with the CFTC as a CPO since March 1, 2021.  Tyche was approved as an NFA Member as of June 7, 2021.  Galles instructed numerous participants to wire funds to bank accounts controlled by Galles in the name of Tyche Asset Management LLC.

13.    **Tyche Master Fund Ltd** is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois.  According to Tyche's filings with NFA, Tyche Master Fund Ltd is a "Master fund (a pool in which its only participants are other pools operated by the same for or an affiliate)."  Galles opened at least two trading accounts in the name of Tyche Master Fund Ltd at registered Futures Commission Merchants ("FCMs").

14.    **Tyche Offshore Fund Ltd** is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois.  According to a private placement memorandum provided by Galles to a registered FCM, this entity "is a collective investment vehicle organized and managed by Tyche Asset Management, LLC."

15.     **Tyche Onshore Fund, LP** is a Delaware limited partnership with its principal place of business in Chicago, Illinois.  According to a private placement memorandum provided by Galles to a registered FCM, this entity is a "feeder fund" into Tyche Master Fund Ltd, with an investment objective of seeking "superior risk-adjusted rates of return with no significant correlation to any major market index" through the purchase and sale of "futures contracts, options on futures contracts, derivatives, securities, options on securities, foreign exchange contracts, and other financial instruments on domestic and international exchanges and markets."  The "investment manager" of the fund is Tyche Asset Management LLC.

16.     **Tyche PML Master Fund Ltd** is a company established in the Cayman Islands with its principal place of business in Chicago, Illinois.  According to a private placement memorandum Tyche filed with NFA, this fund is a "master" fund commodity pool under the management of Galles and Tyche Asset Management LLC.

17.     **Tyche PML Onshore Fund LP** is a Delaware limited partnership with its principal place of business in Chicago, Illinois.  According to a private placement memorandum Tyche filed with NFA, this fund is a "feeder" fund into Tyche PML Master Fund, Ltd, with Tyche Asset Management LLC functioning as the "Investment Manager" of both, and Tyche Onshore Fund GP LLC being the fund's "General Partner."

18.     **Tyche Onshore Fund GP, LLC** is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  It is the "general partner" of Tyche PML Onshore Fund LP.

19.     **Tyche Asset Trade LLC** is a Delaware limited liability company with its primary place of business in Chicago, Illinois.  In a private placement memorandum Galles provided to a registered FCM, Tyche Asset Trade LLC was described as a "proprietary trading firm" affiliated with Tyche Asset Management LLC.  Galles solicited several participants to execute an "investment

agreement" with Tyche Asset Trade LLC, with Galles purportedly acting as the "investment manager."

20.     All of the Tyche entity defendants share a single website: tycheam.com.  Despite being incorporated or organized in various jurisdictions, the Tyche entity defendants' business operations are all conducted from the same offices and through the same employees.  Galles comingled funds received from participants in various Tyche entity bank and trading accounts for the various Tyche entities.  There was no operational distinction between the entities in the overall Tyche business scheme.  The Tyche entity defendants operate as a common enterprise.  Galles controls the operations of the Tyche entity defendants, including their financial activity in bank and trading accounts.

## IV.     STATUTORY BACKGROUND

21.     Galles and the Tyche entities operate a "Commodity Pool" as defined by the Act.  Section 1a(10) of the Act, 7 U.S.C. § 1a(10), defines a "commodity pool" as any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any commodity for future delivery, security futures product, swap, or commodity option.

22.     Tyche Asset Management LLC is a "Commodity Pool Operator" as defined by the Act.  7 U.S.C. § 1a(11)(A)(i), in relevant part, defines a CPO as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including commodities for future delivery, security futures products, and swaps.

23.     The individuals who Galles solicited to invest with Tyche are "participants" in the pool within the meaning of Regulation 4.10(c), 17 C.F.R. § 4.10(c) (2022), which defines a "participant" as any person who "has any direct financial interest in a pool (e.g., a limited partner)."

24.     Galles is an AP of Tyche as defined in Section 4k of the Act, 7 U.S.C. § 6k, and Regulation 1.3, 17 C.F.R. § 1.3 (2022).  Those provisions, with certain qualifications, define an AP as a natural person associated with any CPO as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (i) the solicitation of funds, securities, or property for a participation in a commodity pool; or (ii) the supervision of any person or persons so engaged.

## V.     THE TYCHE SCHEME

### A.  Overview of the Scheme

25.     Defendant Galles has received at least $6 million from approximately 50 individuals throughout the United States since October 2019 to invest with Tyche.  Galles described Tyche to prospective participants as a "managed futures" fund that traded futures and options contracts on the Chicago Board of Trade and Chicago Mercantile Exchange.

26.     Galles claims he is a billionaire hedge-fund magnate who oversees Tyche's sprawling trading operation, which he claims has more than 100 employees based in offices in Chicago, Miami, London, and other locations.  Galles further claims to employ sophisticated technology and strategies that have generated returns in excess of 200% in recent years trading commodity futures and options.

27.     Galles boasts to prospective participants of the depth of his experience and expertise trading commodities.  He has bragged about his educational achievements, claiming to be the valedictorian of a prestigious U.S. university.  He has touted his past success as a manager of a hedge fund based in Bermuda, where he supposedly was responsible for managing a portfolio worth billions of dollars.  He claims to have sold a previous fund before launching Tyche in 2019 after awaiting the expiration of a non-compete agreement.  All of these claims were lies or gross exaggerations.

28.     Galles also used Tyche's status as an entity registered with the CFTC to deceive participants into depositing funds with Tyche.  Galles lied to obtain this registration in the first place.

Galles filed documents with NFA to register Tyche Asset Management LLC as a CPO.  In filings with NFA, Galles represented that this entity would–in the future–be responsible for operating numerous commodity pools.  Significantly, in his applications and in all subsequent filings Galles expressly represented that the Tyche funds were not currently active, and he and Tyche were not soliciting participants.

29.     Galles also bolstered his pitch to prospective participants by cultivating an image of personal wealth and sophistication.  For example, in public posts to his "phillip_g724" and "tradeitup" Instagram accounts, Galles:

        a.  boasted about his luxury car collection that supposedly included multiple Lamborghinis and Ferraris;

        b.  bragged about his luxury homes in Miami, Chicago and Palm Beach;

        c.  described his high-end watch collection alongside photos of Rolex and Longines watches;

        d.  claimed to be hanging art by Picasso and Chagall in one of his homes; and

        e.  touted the opening of offices in Chicago, Miami and London in October 2022 ("Chicago office is coming along. Miami's build out is next and then headed to London to open our office there.").

30.     Galles' claims about his personal and business success are lies.  In fact, since he first opened a bank account in the name of a Tyche entity in 2019, Galles has used almost none of the funds he received from participants to place any trades.  Instead, Galles has used the money he received into Tyche bank accounts from the participants he solicited (or hired others to solicit for Tyche) to fund his lavish lifestyle and to further promote his fabricated image of a hedge fund magnate.

**B. Galles' Fabricates Tyche Operations, Trading Strategies, and Investment Returns**

31. Galles made a grandiose pitch to prospective participants. In a "Fire Side Chat" video posted to Youtube in January of 2021, Galles advertised his Tyche fund. During this public interview, Galles echoed false and misleading statements that he also made directly to prospective participants. Galles made false claims, including that:

   a. Tyche had "in the U.S. $275 million under management, and $1.7 billion off shore."

   b. "Last year we had a stellar year, a 238% return."

   c. "I've been in hedge fund industry since 2008. From 2011 to 2018 I was part owner of a company called Peregrine. We were based in Bermuda. We were a $3 billion hedge fund, and I've been averaging about 22% return every year since 2010. Last year's 238% gain brings that average up to over 44%."

   d. "I've got about 30 employees that work for us, and 15 of them are ex-Goldman employees."

   e. "Everything is based off of algorithms and programmers."

   f. "60% of our trades go through the S&P and NASDAQ. Another 40% are used in currencies and bonds, depending on how we see the market."

   g. "As of next summer we will be a $5 billion fund, and I just raised $3 billion from a New York Pension group."

   h. "I can do up to $10 billion managed-wise. After that it gets a little too difficult […] We're small and nimble […] I'm trying to stay under the $10 billion mark."

32. Galles used a similar pitch in promotional materials provided directly to participants. For example, Galles and Tyche claimed in promotional materials that:

   a. Tyche is "Committed to delivering Prosperity and Fortune to our clients."

b. "Tyche was founded in late 2018 after analyzing years of model combinations on Long-Term, Intermediate-Term, Short-Term, High-Frequency & Options strategies coordinated to technically drive as one. This strategy has proven the possibility of generating annual returns of 25%+ each year."

c. "Tyche is a new venture whose genesis is the vision of founder Phillip Galles. Galles has 30 years of Stock Options, Futures, Foreign Exchange & Risk Arbitrage experience. Phillip started on the Floors of the CBOT and CBOE as a market maker for Stock Options, Bond Options, Futures, FX Options, and off the floor Risk Arbitrage from 1992-2007. In 2007 Phillip joined the hedge fund world starting at the Pelerine Fund as a FX Forward and FX Options trader. From 2012 to 2019 Phillip joined the Peregrine Fund and became a Senior Asset/Portfolio Manager-Partner and eventual owner of the fund capping off an average return of over 24% every year for that duration. During his time there he developed the use of his highly profitable "Swing Trade" technique which lasts from (1 to 4 day). He also used another profitable technique called "Medium Term" (30, 60 & 240 minute) along with a short term "High Frequency" strategy. During those years Phillip started using a technically based trading concept working with a combination of Futures and Options. Phillip's current model is based on many market momentum concepts while still using his own proprietary Short-Term methodology & Swing Trade concepts. Phillip has been a registered CME Member, CBOE & NFA member as well."

d. "Tyche's current strategy is to filter in low-risk entry to gain access at exactly the precise moment to maximize potential gains. After entry, the model is designed to define risk with each additional position and evaluate levels in real time to establish

an exit strategy as the market regresses to the mean. We closely monitor open positions to lower our risk, both upside and downside until objectives are achieved."

e.   "Additionally, our Long-Term Model uses longer time frames seeking Undervalued and Overvalued market extremes. We use Call and Put Options to help with fluctuations before the extremes in the market are generated.  This intertwines our short-term approach with our long-term positions. This combination aims to significantly lower the volatility and drawdowns for longer-term positions, while the short-term is actively managed using an intraday strategy. The long-term approach is directional and can be highly correlated together with the short-term."

f.   "In summary: Our risk management techniques are designed to limit daily drawdowns to 5% of margin.  When compounded over time, returns may outperform the Dow Jones Industrial Average, Nasdaq Composite, and the S&P 500 with less downside volatility.  Our non-correlated model-driven approach tempers the downside volatility while aiming to enhance returns during trending markets."

g.   "Tyche is dedicated to 'Prosperity and Fortune.' We have a strategy that focuses on generating consistent income through our proven proprietary trading strategy."

h.   "We're continuously grateful for our success, but we are never fully satisfied. Outperformance is our expectation, and our definition of a meaningful Long-Term Investment is one that stretches far beyond a few weeks, months, or years."

33.   Galles also gave prospective participants promotional materials in which he fabricated trading strategies supposedly employed by Tyche.  For example, in a presentation provided to one participant, Galles described the purported trading strategies employed by Tyche.  Galles described an "Automated Trading Model" with a "Repeatable Strategy."  He claimed that Tyche "continuously evaluates thousands of securities prices for multiple time frames simultaneously."  He went on to

describe five "automated trading models looking across 11 different time frames for Futures; S&P500, Nasdaq 100; Treasuries, Crude Oil, Gold and FX."

    a.  "Model 1: Directionally biased Market Making. The algorithms mimic an experienced market maker, but with a speed, accuracy no human trader could achieve, over a number of instruments simultaneously.

    b.  Model 2: Algorithmically determined 'inflection points' are filtered using order book dynamics/market microstructure analysis to profit from price movements in either direction around these areas.

    c.  Model 3: Continuously evaluates thousands of securities prices across multiple time frames simultaneously, referred to as 'local rotation analysis' to determine the rotational direction in the market.

    d.  Model 4: Complete 'U' Rotation. Primarily mean reverting. However, longer term model instances will not trade against a strong trend. Directionally biased market making (short term trading) based on 30 years of historical data. Repeat?

    e.  Model 5: Standard Pattern Recognition algorithm with continual optimization based on years of historical data used to make trading decisions without curve fitting."

34.    None of these models had any basis in reality. Galles and Tyche placed only a few trades in a futures trading account in the name of a Tyche entity, and those futures trades did not occur until January of 2023, well after Galles claimed to have been employing these purported models.

35.    Galles had participants sign agreements with various Tyche entities including Tyche Asset Management LLC and Tyche Asset Trade LLC. Galles and Tyche made misleading statements and misrepresentations in these participant agreements. For example,

    a.  "The investment manager undertakes to maintain the funds entrusted to it separate from its own assets and away from the claims of creditors."

b. "The Manager performs investment advisory services for various clients and the investment funds (including the Pooled Funds) that it manages.

c. "The Manager . . . will ensure that all investments and recommendations made on behalf of the Account are suitable for the Client."

36.     Galles and Tyche also provided prospective participants and participants with a fictional trading history for Tyche, and specific, false historic trading results.  For example, Tyche promotional materials stated that Tyche had no losing months; that Tyche had a 190.18% rate of return for 2020; a 133.22% rate of return for 2021; and a year-to-date rate of return of 84.51% for 2022 as of July 2022.  In another presentation to a different participant, Galles and Tyche claimed that Tyche outperformed the S&P 500 by more than 300% in 2020.  All of these figures are made up. Tyche did not place any trades in any trading account during this time period.

37.     In fact, Tyche did not place any trades at all in 2020, 2021 or 2022.  The only trades placed in a Tyche futures trading account occurred in January and February 2023.  And those few futures trades were in an account that first received a deposit of $25,000 in September of 2022.  Most of the funds in that trading account were withdrawn by Tyche in February 2023, after only a few trades.

38.     Galles' and Tyche's claims of massive profitable trading returns in promotional materials, in verbal statements, and in account statements provided to participants, are a complete fabrication.

**C.  Galles Misappropriated Tyche Participant Funds to Support a Lavish Lifestyle**

39.     Galles used the funds deposited by participants into Tyche's bank accounts to pay his own personal expenses, to repay certain earlier participants, and to pay expenses designed to make Tyche appear to be a legitimate operation.

40.     In general, Galles directed the individuals he solicited to invest with Tyche to deposit their funds into a bank account in the name of Tyche Asset Management LLC.

41.     For example, in February of 2021 Participant A made an initial investment with Tyche, depositing $25,000 into a bank account in the name of Tyche Asset Management LLC. Those funds were not transferred to any trading account. Instead, in the days following the deposit of Participant A's funds, Galles used the funds to pay personal expenses including payments to Uber, Macy's and Best Buy.

42.     On September 6, 2022, Participant B deposited $200,000 to a bank account in the name of Tyche Asset Management LLC. The following day, Participant C deposited $100,000 to that same Tyche bank account. Only a small portion of the funds received into this Tyche bank account during September 2022 were transferred to a trading account, and ultimately almost none of this money was used for trading activity.

43.     The customer funds deposited to Tyche's bank account in September 2022 were instead used for other purposes, such as the repayment of portions of investments made by certain earlier participants, payments to Tyche employees or contractors, or for personal expenses. In September 2022, Galles transferred at least $55,000 to employees or contractors for Tyche, made payments of at least $40,000 to law firms, paid $18,790 in rent for his personal residence in a high-end apartment building in Chicago, spent more than $14,000 at a jeweler, paid $6,000 to Dynasty Luxury (a luxury car rental service in Miami), and paid $19,282.80 towards a credit card.

**D.  Galles Controlled the Tyche Entities**

44.     Galles controlled the operations of the Tyche entity defendants. According to a Tyche private placement memorandum, Galles is "the founder and sole owner of the General Partner and Investment Manager and the trading principal of the [Tyche] Master Fund. […] In November 2019,

Mr. Galles began forming the Investment Manager and now serves as its Chief Executive Officer, Chief Investment Officer, and Chief Compliance Officer."

45.     Galles is identified in filings with the CFTC and NFA as the key point of contact and the executive responsible for various key functions for Tyche.

46.     Galles first applied to the CFTC to register Tyche Asset Management LLC as a CPO on March 25, 2020.  The application states that it was "submitted by Phillip Galles."   Galles is listed as the only point of contact for Tyche Asset Management LLC in this and the other applications filed for Tyche Asset Management LLC to register with the CFTC as a CPO.  Galles is identified as the point of contact for Tyche's enforcement, NFA membership, accounting, arbitration, and compliance functions.

47.     Galles is also identified as the key point of contact at Tyche in filings with NFA. According to a Pool Quarterly report for CPOs submitted on behalf of Tyche for the quarter ending December 31, 2021, for example, Galles is identified as President, Chief Compliance Officer and the relevant point of contact for Tyche Asset Management LLC.

48.     Galles is also a signatory for and an authorized person for all of the Tyche entities' bank and financial accounts.  Galles signed account opening documents for Tyche Asset Management LLC in applications for accounts at several banks in Chicago.  Galles identified himself as the "Managing Member" of Tyche Asset Management LLC on bank account opening documents.

49.     Galles signed corporate resolutions for Tyche entities.  For example, Galles signed a December 2020 resolution as the "designated representative" of Tyche Asset Management LLC to authorize his access to and control over a TAM LLC bank account at Chicago-based bank.

50.     In an application Galles submitted to an FCM to open a trading account in the name of a Tyche entity, Galles represented that he is the only person authorized to act on behalf of the Tyche Master Fund Ltd.

**E. Tyche Issued False or Misleading Account Statements to Participants**

51.     During the Relevant Period, Defendants sent periodic account statements to participants that misrepresented the value of their respective interests in the Pool, and falsified returns. The statements reflected that Tyche participants' funds were earning consistent profits with no losses.

52.     For example, Participant B received a Tyche "Earnings Statement" for "Fourth Quarter 2022." This document included the following claims: "For the Fourth Quarter of 2022, Tyche Asset Trade generated a Net Return of 25.47%." This statement was false, as Tyche did not place any trades during the fourth quarter of 2022.

53.     The Quarterly statement provided to Participant B also represented that Tyche's "Proprietary Model-Driven Performance" outperformed the S&P 500 index in each month of the 4th quarter of 2022. The statement claimed Tyche achieved a return of 11.7% in October 2022; a 7.58% return in November 2022; a 6.19% return in December 2022; and a year-to-date return of 137.39%. These figures were entirely fabricated, as Tyche had no trading activity at all in 2022.

54.     In a quarterly account statement issued to Participant B for the period ending March 31, 2023, Tyche valued the participant's account at $354,578.53, and claimed a 25.92% rate of return for the account, with income during the first quarter of 2023 of $72,988.21. These figures were fabricated, and the statement issued to Participant B was false.

**F. Galles Lies to Prolong His Scheme and Delay Return of Funds**

55.     In late 2022, Galles' scheme began to unravel as several participants sought to withdraw their funds. Galles did not have sufficient funds to meet these customer withdrawal requests. Galles attempted to delay the return of participant funds by lying about, among other things, the location of Tyche funds, and the process he needed to undertake to return investor funds.

56.     For example, on December 12, 2022, Participant C submitted a request to Tyche to withdraw a portion of his invested funds.  Galles did not immediately return any funds, but indicated that he would begin the process of returning this participant's funds.

57.     As of February 6, 2023, Galles and Tyche had not returned the Participant's funds.  On February 6, 2023, Galles told Participant C that he was at the bank, claiming he was on the verge of correcting purported problems sending the participant's funds by wire transfer.  Galles write, "I think everything is cleared up.  I'm just waiting for them to send me this last docusign.  Then I should be good to go."  He added, "Trying to get this out before 4 PM.  If not, you'll get it tomorrow morning for sure I'm gonna be sending you 55,000 to cover the problems that we had in the last few weeks.  I truly apologize that this got so fucked up."

58.     The next day, February 7, 2023, Galles wrote to Participant C:  "Money will coming from Wintrust this morning.  It will come in small amounts because they are limiting me to 100k a day and 25k per customer in transfers.  You will see 25k this morning.  I will be at BMO later this morning to get that solved so that we can wire from multiple accounts.  Finally getting things out.  So sorry for the delay."

59.     When the wire did not immediately arrive, Participant C followed up.  Galles told Participant C that he "just got an email from her You should see it.  In the next half hour they had to ask more questions in the wire department.  So I called them.  I literally just got off the phone with them about pushing us through right now."

60.     Galles was unable to return the full amount of Participant C's funds.  On February 15, 2023, Participant C asked "when do I get rest of distribution?"  Galles responds that he would have sent it, but his daughter had serious medical issues that needed to be addressed that impeded his ability to wire all of the requested funds.

61.     Galles continued to delay and make additional excuses for his inability to return the participant's funds.  On February 16, 2023, Galles wrote to Participant C that "I am headed back to Chicago later this afternoon.  I have to go to Milwaukee to pick my car then head back home.  The banks do not have us set up to make wires from my online account so I have to go in there and get things set up.  I will text you tomorrow once everything is done"

62.     On February 18, still not having received his funds, Participant C wrote to Galles: "I ended up putting my property taxes on my credit card.  3 properties.  All together it's $50k.  Thought I would have money weeks ago.  Credit cards are at 18% interest.  I'm not worried about a wire fee. I just want to get these damn credit cards paid off.  Please send money!!!!!!!!!!!! No one has replied toot [sic] my email.  I want my entire balance back.  Filled out the form.  When do I get that???"

63.     On March 3, 2023 Galles wrote to Participant C that his money "will go out Monday because [another participant] wanted all of her money now so I had to put everybody else on Monday. I'm still here trying get them to raise the limit so I can go above $500,000.  She said that everybody else needed to wait because she's been on hold the longest."

64.     On March 24, 2023, still making excuses, Galles sends Participant C an image of a purported pending balance of a checking account at BMO Harris for $20,200,000.  Galles claimed he was waiting for the pending funds to clear to the account in order to send funds.

65.     On March 27, 2023, Galles claimed "I talk to the head of compliance and the law department and I wasn't aware that they put a 48 hour hold because it was transferred to a new account which they are holding tomorrow 10% of the total transfer which I already knew of and then I'll be able to transfer Wednesday morning Everything out.  Friggen finally!!! Yay I feel relieved"

66.     On March 29, 2023 Galles continued to make excuses to delay returning funds.  "Ran into a major personal problem which put in the emergency room.  I will be out in a little bit.  A pill

opened up in my throat by accident and closed my throat for 2 full minutes. I thought that it was an onion and tried to get it back up. It didn't go so well."

67. Galles employed similar delay tactics, and made similar excuses as to his inability to return funds, in communications with other Tyche pool participants who attempted to withdraw funds during the fall of 2022 and spring of 2023.

### G. Galles and Tyche Asset Management LLC Lied in Filings with NFA, and in Response to Questions from NFA Examiners

68. Galles not only lied to participants, he also lied to regulators. Galles' and Tyche Asset Management's misrepresentations began with the applications filed to register Tyche as a CPO, and continued through false statements to NFA staff in April of 2023 after NFA initiated an examination of the Tyche entities following complaints by customers about potential fraud by Galles and Tyche.

69. Galles filed, or caused to be filed, various reports with NFA in order to maintain the registration of Tyche Asset Management LLC as a CPO.

70. As a part of its regulatory duties, NFA requires that member firms including CPOs such as Tyche Asset Management LLC complete and file an Annual Questionnaire. The questionnaire provides NFA with information on a member's activities and operations, serves as a continuous source of data for NFA's risk monitoring systems, and is frequently the first resource that NFA staff reviews when engaging with or performing work related to a Member.

71. Tyche Asset Management LLC, acting through its employees or agents including Galles, filed an Annual Questionnaire with NFA on July 13, 2022 for the annual period ending May 31, 2022. On the questionnaire, the primary contact for Tyche Asset Management LLC was Phillip Galles, and Galles was also identified as the Chief Executive Officer of the firm.

72. The first substantive question on the Annual Questionnaire form asks, "Does the firm currently have customers and/or pools that engage in activity relating to commodity interests?" Tyche Asset Management LLC answered "No." The second question on the form asks, "Does the firm

currently solicit customers to trade commodity interests? Tyche Asset Management LLC answered "No." Tyche Asset Management LLC also represented in this form that while it had three commodity pools, it had "not yet accepted investor funds into the pools." These statements to NFA were false. The Tyche entities had been soliciting and accepting funds from customers to trade commodity interests since at least 2019.

73.     NFA also requires CPOs to file quarterly reports. Tyche Asset Management LLC filed at least seven quarterly reports with NFA between June 2021 and December 2022. In each of those quarterly reports, Tyche Asset Management LLC stated that it had no assets under management and no assets or liabilities. These statements were false, as the Tyche entities had accepted funds from participants for the purpose of trading commodity interests, and had substantial liabilities to its participants.

74.     In April 2023, in furtherance of its official duties under the Act, NFA staff initiated an examination of the Tyche entities. In connection with that examination, NFA representatives spoke with Phillip Galles.

75.     On April 3, 2023, Galles told NFA representatives that the Tyche entities did not have any customers. Galles told NFA representatives that Tyche did engage in trading, but only "proprietary" trading through an affiliated entity. These statements are false and misleading because Galles and the Tyche entities had been soliciting customers and accepting customer deposits since at least 2019 for the purposes of trading commodity interests in a commodity pool.

76.     On April 3, 2023 Galles also told NFA representatives that Tyche was engaged in futures trading through a proprietary account at UBS. This statement is false, as the Tyche entities do not have any account at UBS.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT 1:  FRAUD IN CONNECTION WITH FUTURES IN VIOLATION OF 7 U.S.C. § 6b(a)(1)(A)-(C), AGAINST ALL DEFENDANTS

77.     The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

78.     Section 4b(1)(A)-(C) of the Act, 7 U.S.C. § 6b(1)(A)-(C) makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person
>
> > (A) to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
> >
> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

79.     Defendant Phillip Galles, and the Tyche entity defendants acting together as a common enterprise, in or in connection with commodities for future delivery made, or to be made, on or subject to the rules of a designated contract market,

> a.    knowingly or recklessly cheated or defrauded, or attempted to cheat or defraud Tyche pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' experience and expertise, trading performance, trading track record, the value of their interest in the Pool, and by misappropriating their funds;

    b.   willfully made or caused to be made false reports or statements to Tyche commodity pool participants; and/or

    c.   willfully deceived or attempted to deceive pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' experience and expertise, trading performance, trading track record, the value of their interest in the Pool, and by misappropriating their funds.

80.    By reason of the foregoing, Defendants violated 7 U.S.C. § 6b(a)(1)(A)-(C).

81.    The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche. Therefore, Tyche is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 6b(a)(1)(A)-(C), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

82.    Defendant Galles controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 6b(a)(1)(A)-(C).

83.    Each fraudulent or deceptive act,, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

## COUNT 2: FRAUD BY A COMMODITY POOL OPERATOR AND ITS ASSOCIATED PERSON IN VIOLATION OF 7 U.S.C. § 6*o*(1), AGAINST DEFENDANTS PHILLIP GALLES AND TYCHE ASSET MANAGEMENT LLC

84.    The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

85.    Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) prohibits any CPO, or AP of a CPO, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly:

    (A) to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

86.     During the Relevant Period, Tyche Asset Management LLC, a registered CPO, defrauded and deceived participants of the Tyche Pool by using the mails or any other means of interstate commerce in violation of 7 U.S.C. § 6*o*(1) by, among other things:

      (a)     misappropriating participant funds;

      (b)     fraudulently soliciting participants and prospective participants by making material misrepresentations and omitting material facts regarding Defendants' experience and expertise, trading profits, trading performance track record, and the value of participants' interest in the Pool; and

      (c)     causing false account statements to be issued to participants in the Pool.

87.     During the Relevant Period, Galles acted as an AP of Tyche Asset Management LLC by soliciting funds for the pool and handling participant funds while being associated with Tyche as a partner, officer, employee, consultant, or agent.

88.     Galles, while acting as an AP of a CPO, defrauded and deceived participants of the Tyche commodity pool by using the mails or other means of interstate commerce in violation of 7 U.S.C. § 6*o*(1) by, among other things:

      (d)     misappropriating participant funds;

      (e)     fraudulently soliciting participants and prospective participants by making material misrepresentations and omitting material facts regarding Defendants' experience and expertise, trading profits, trading performance track record, and the value of participants' interest in the Tyche commodity pool; and

      (f)     causing false account statements to be issued to participants in the Tyche commodity pool.

89. Defendants willfully engaged in the acts described in this Count.

90. The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche. Therefore, Tyche is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 6*o*(1), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

91. Defendant Galles controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 6*o*(1)(A) and (B).

92. Each fraudulent or deceptive act, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

### COUNT 3: COMMODITY FRAUD IN VIOLATION OF 7 U.S.C. § 9(1) AND 17 C.F.R § 180.1(a)(1)-(3), AGAINST ALL DEFENDANTS

93. The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

94. Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), provides, in pertinent part, that:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate[.]

95. The Commission issued CFTC Rule 180.1, 17 C.F.R. § 180.1 (2022), pursuant to this authority. Rule 180.1(a)(1)-3) state, in pertinent part, that:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to

make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

96.     Defendant Phillip Galles, and the Tyche entity defendants acting together as a common enterprise, intentionally or recklessly, in connection with contracts of sale of commodities for future delivery on or subject to the rules of a registered entity,

  a.  used or employed, or attempted to use or employ, a scheme or artifice to defraud;

  b.  made, or attempted to make, in connection with contracts of sale of commodities in interstate commerce, untrue or misleading statements of material fact, or omitted to state material facts necessary to make the statements made not untrue or misleading; and/or

  c.  engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on Monex's customers.

97.     As a result of the foregoing conduct, Galles' and Tyche's fraudulent conduct violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

98.     The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche.  Therefore, Tyche is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

99.     Defendant Galles controlled Tyche directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

100.     Each fraudulent or deceptive act, including without limitation those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

**COUNT 4:  COMMINGLING OF FUNDS, FAILURE TO RECEIVE FUNDS IN POOLS' NAME, FAILURE TO OPERATE SEPARATELY OPERATE POOL, IN VIOLATION OF 17 C.F.R. § 4.20, AGAISNT TYCHE ASSET MANAGEMENT LLC AND PHILLIP GALLES**

101.     The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

102.     With certain exemptions not applicable here, 17 C.F.R. § 4.20(a) requires that a CPO must operate its commodity pool as an entity cognizable as a legal entity separate from its operator.

103.     17 C.F.R. § 4.20(b) prohibits CPOs from receiving pool participants' funds in any name other than that of the pool.

104.     17 C.F.R. § 4.20(c) prohibits a CPO from commingling the property of any pool it operates with the property of any other person.

105.     Tyche Asset Management LLC, while acting as a CPO, failed to operate its commodity pools as legal entities separate from the pools' operator, failed to receive pool participants' funds in the name of the pools when funds were deposited funds into Tyche Asset Management LLC's bank accounts, and commingled the property of the pools and pool participants' funds with property of Defendants and others.

106.     By reason of the foregoing, Defendant Tyche Asset Management LLC violated 17 C.F.R. § 4.20(a)-(c).

107.     Defendant Galles controlled Tyche Asset Management LLC directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche Asset Management LLC's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 17 C.F.R. § 4.20(a)-(c).

108.     Each act of improperly receiving pool participants' funds and commingling the property of the Tyche pool with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(b)-(c).

### COUNT 5 – MISREPRESENTATIONS TO NATIONAL FUTURES ASSOCIATION IN VIOLATION OF 7 U.S.C. § 13(a)(4), AGAINST TYCHE ASSET MANAGEMENT LLC AND PHILLIP GALLES

109.     The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

110.     Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4), makes it unlawful for any person willfully to falsify, conceal, or cover up by trick, scheme or artifice a material fact, or to make any false, fictitious, or fraudulent statements or representations, or to make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, swap data repository, or futures association designated or registered under the Act and acting in furtherance of its official duties under the Act.

111.     Tyche Asset Management LLC and Galles violated 7 U.S.C. § 13(a)(4) by willfully:

   a.   falsifying, concealing, or covering up by trick, scheme or artifice, material facts about the operations of the Tyche entity defendants in filings with, and in communications with representatives of, NFA, a futures association designated or registered under the Act acting in furtherance of its official duties; and

   b.   making false, fictitious, or fraudulent statements or representations to NFA, a futures association registered under the Act, in connection with an examination, in furtherance of National Futures Association's official duties under the Act.

112.     The foregoing acts, omissions, and failures occurred within the scope of Galles' employment or office with Tyche Asset Management LLC.  Therefore, Tyche Asset Management

LLC is liable for his acts, omissions, and failures in violation of 7 U.S.C. § 13(a)(4), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

113.     Defendant Galles controlled Tyche Asset Management LLC directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Tyche Asset Management LLC's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Galles is liable for Tyche's violations of 7 U.S.C. § 13(a)(4).

114.     Each act of willful concealment and/or false, fictitious, or fraudulent statement Galles and/or Tyche Asset Management LLC made to NFA including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 13(a)(4).

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

(a)      An order finding that Defendants violated Sections 4b(a)(1)(A)-(C), 4*o*(1), 6(c)(1) and 9(a)(4) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6*o*(1), 9(1), and 13(a)(4), and Commission Regulations 4.20(a)-(c) and 180.1(a)-(c), 17 C.F.R. §§ 4.20(a)-(c), 180.1(a)-(c) (2022).

(b)      An order of permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

    (i)      engaging in conduct in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6*o*(1), 9(1), and 13(a)(4), and 17 C.F.R. §§ 4.20(a)-(c) and 180.1(a)-(c);

    (ii)     trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    (iii)    entering into any transactions involving "commodity interests" (as that term is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)), for Defendants' own

accounts or for any account in which they have a direct or indirect interest;

(iv)    having any commodity interests traded on Defendants' behalf;

(v)    controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

(vi)    soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

(vii)    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

(viii)    acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9);

(d)    An order requiring Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

(e)    An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the pool participants whose funds were received by them as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

(f)     An order requiring Defendants to make restitution by making whole each and every pool participant whose funds were received or utilized by them in violation of the provisions of the Act and Regulations as described herein, including pre-judgment interest;

(g)     An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act, as described herein;

(h)     An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

(i)     Such other and further relief as the Court deems proper.

Date:   May 11, 2023                          Attorneys for Plaintiff,

Commodity Futures Trading Commission

***/s/ Carlin Metzger***
IL ARDC No. 6275516

Carlin Metzger (cmetzger@cftc.gov) (312) 596-0536
Senior Trial Attorney

David Terrell (dterrell@cftc.gov) (312) 596-0539
Chief Trial Attorney

Scott R. Williamson (SWilliamson@cftc.gov)
Deputy Regional Counsel

Commodity Futures Trading Commission
Ralph Metcalfe Federal Building
77 W. Jackson, Suite 800
Chicago, IL 60604
(312) 596-0700
(312) 596-0714 (fax)